The next case for argument is 18-2098, Guilier v Kowasaki wheeled car. I think we're ready to go, whenever you're ready. Good morning, Your Honors. My name is Darius Kehani. I represent Mr. Scott Blair, the patent owner, an appellate in this matter. The issue on appeal here relates to the patent board's, what the patent owner, Mr. Blair believes, non-substantiated bringing together or consideration of Namikawa and the Sassau reference. As we argued in our briefing, Sassau is a reference that is distinct from all the other two, and relied upon, that Kawasaki argued, it is, relates, it is so remote that one of ordinary skill in the art would not have considered this, would not have pulled this reference out of any stack or choices of possible references out there. It's very important to look at the type of precedent that this type of approach that the board took in terms of considering the Sassau reference in this decision, final written decision would create. You have a situation here, and it's very important in all of these cases, when we are looking to decide whether something is analogous or relevant art, to get a little bit into the facts and think about the perspective of what of ordinary skill in the art. Can I ask you, as you know, as you well know, there's a threshold issue about whether or not you appropriately preserved this argument with respect to non-analogous art. The only response is I understand it, so tell me if I'm wrong, you have, is that it was somehow implicit because obviously if the board was going to consider this piece of prior art, they would have thought that that was analogous. To me, that's really not sufficient for you to have preserved your argument on analogous art, so tell me why I'm wrong or tell me what else there is. Your Honors, the issue of whether art is analogous or not is a factual determination underlying the issue of non-obviousness, the legal issue of whether or not a claim is obvious or not obvious. The factual considerations that we raise on appeal, every single one of which we raise at the patent board, in the patent board proceedings. In particular, the differences between the function and structure, which we describe and we argue repeatedly that in the case of Sassau, we're dealing with a cabinet, the hiding of a cabinet, a rear projection TV, a cabinet for a rear projection TV behind a wall in a house or in a subway car. How could you compare, how could you look at these two as relevant context? So we make these art, this is a structural function difference. There's a mounting of the TV in the subway car, the TV in Sassau is sitting on the floor, pushed against the wall in a room. There are safety considerations, there are temperature considerations, there are all kinds of contextual considerations. These considerations, these arguments were all made during the course of our arguments at the patent board. We have appendix 257, appendix 267, appendix 387, even during oral argument. I personally argue, when I was asked by Judge Lee at the patent board, couldn't somebody just make the screen substantially flush, someone of ordinary skill in the art, and I argued, it's in the transcript, at appendix 387, I said, the question isn't whether one could do this. The question is whether it would be, one of ordinary skill in the art would have taken, would have found relevant, really, the different context, the different environment, the different circumstances and factors to bring these two together. And we also specifically, and this is in our brief, appendix 267, we specifically argue that the problem is different. We're dealing with the two references, the invention, Mr. Blair's invention, and the Sassau reference relates to a different problem. And the problem in Sassau was how do we hide a TV, I'm sorry, a TV cabinet that created sort of distraction in another room, outside of the room, whereas the problem in Blair was how do we often replace TV screens at a particular angle on the walls of a subway car. So function and structure and problem, those are the synchronon of analogous art or defined analogous art. And we argued explicitly that this is a different problem, and we argued explicitly this is a different structure and function. Throughout our briefing, including at oral argument, or at the trial at the board, there was no requirement, Your Honors, that a specific word, magic word, be used. In fact, the word non-analogous art is not consistently used in the various by various panels in the precedent. When defining what is obviousness, the four, and for example, the Klein case, the Court speaks to four factors of what defines Section 103, obviousness. It doesn't reference analogous art as one of them. It later discusses analogous art as one way to think about, for example, is the prior art, is the scope and content of the prior art relevant? Is there substantial similarities between the prior art and the invention? So the notion or the concept of non-analogous art is not even articulated as an element itself under the governing precedent, but rather a way to think about the similarity of the art, the relevance of the art. It's a predicate. It is a concept that is embedded or is inherent in a non-obviousness argument. And there's no reason why the patent owner needed to, say, use the magic word. Rather, the patent owner came forward and argued the facts, argued that the structure and function are different in all the references that I made. Also, we went through the specification of the Blair patent. We pointed out all the various claim elements that are distinct structurally and functionally from the Sassau reference. Let me just name a few, for example. In the Blair patent, we have a we have a we're talking about a TV media system, not a single television, a TV media system in an underground subway car situated at the top side surface, obliquely facing downwards, so a substantial amount of the passengers can see this TV media system on all sides. It's a TV media system in a subway car, a subway car TV media system. Sassau has got a complete different structure and function. We're talking about a cabinet, a rear projection, one of these huge televisions back in the 70s and 80s, some 90s, that is in a room, and you're trying to hide this TV cabinet. And you have the luxury of a separate room, this huge space in a separate room. So this is a complete different structure and a complete different function we're looking at. And we've argued all these facts. And hiding a large cabinet for a rear projection TV in a separate room is a completely different structure and is a completely different problem. And we've argued repeatedly in the record, including the exemplary references that I mentioned, that we have a different problem and we have a different structure and function. And by arguing those are the key elements that this Court, its various precedents, has pointed out as defining an analogous or non-analogous art. So we've argued all these facts. And in our appeal here, we've not raised any new facts. We've not raised any new arguments. We have simply reiterated the factual arguments that we've made. These factual arguments underlie or are inherent in the non-obviousness argument and also relate to the claim elements, or rather the claim elements, but the elements of what non-obviousness is, Your Honor. And so we do believe that we've preserved the record on this issue. The only thing more we could have done, Your Honor, is to actually have said the word non-analogous art. And now what we have a situation here, which we did not do admittedly, but otherwise the record is complete with a plethora of references and arguments, even at the hearing, at the trial, where we make the point that this is a reference that's not functionally, not structurally analogous, and it's a different problem. And this also goes to the issue of the motivation to combine. How would a pasita have the motivation to combine? Where would that come from when you're dealing with a reference that is in a completely different environment? Even the references that Kawasaki cites and the patent board relies upon are all similar except for the Sasau reference. They all involve monitors in rail cars or subway cars, Amano, Namikawa, every one of them, Maekawa, except Sasau. Sasau was needed. They could not find. The board could not find a reliable reference or could not be comfortable with a reference involving a media system in a car. Could not find one. There was none that it could be comfortable with and apply that had a substantially flush screen. It had to go to a TV in a house, a reference that was not actually about the TV screen, but it was a cabinet, hiding a cabinet in a house. And this was about trying to deal with having more space and sort of disposition of the cabinet, not the screen. And that's the only reference that they could find. In fact, the only aesthetic reference in this Sasau reference was about the frame around the screen in this cabinet on the TV, which actually was protruding from the wall. So it wasn't even flush. That was the only aesthetic reference. And we cross-examined Kawasaki's expert. I cross-examined him myself and asked him, you know, the questions regarding whether you would have, whether you would think an LCD would have to be cooled down. And he admitted that an LCD would need to be cooled. He admitted that having things in the wall would create more heat. He admitted that there would be limitations of space. And in the case of Sasau, there are no limitations of space. In fact, they used a whole room to put a TV in there. We didn't have the luxury in a rail car to have a separate room to put a cabinet in it. There were other factors that were also considered, and they were found to be contrary to any motivation to comply. This fire safety issue came up, and Kawasaki's expert conceded that there is a fire safety concern. In fact, the FRA that the board relied on, and Kawasaki argued throughout this hearing, was about this FRA document, was this sort of aspirations about what are the best standards for designing these rail cars, and fire safety was one of the lead concerns. I don't want to interrupt you, but you're well into your rebuttal time. Okay, I'll stop at this point.  Thank you, Your Honors. Good morning, Your Honors. May it please the Court. I'm Sheila Murtazavi, representing Attali Kawasaki. This Court should affirm, because substantial evidence in the record supports the board's finding, that one of ordinary skill in the art would have been motivated to and able to flush-mount video displays in rail cars at the time of the alleged invention. The primary reference, Namikawa, teaches all of the limitations of Independent Claim 1, except arguably having the screen substantially flush, and then only because a portion of the sides of the LCDs in Namikawa appear to protrude slightly. So the question is, are the differences between the subject matter that was thought to be invented, and that which was in the prior art, such that the subject matter as a whole would have been obvious? And in this case, the evidence clearly suggests that it would have been, and the board correctly found that to be the case. Yeah, but the board did combine a reference which your friend argues was non-analogous art, and therefore it was precluded, in his view, it was precluded from doing that. The board did rely on that reference and did combine the references, but I would submit to the court that there is substantial evidence to support the board's findings independent of CECEL, which themselves would independently support obviousness in this case. And what I mean by that is, if you turn to the board's opinion on page 28, the board found that with the introduction of video systems in rail cars during this time period, the requirement for smooth or clean interior surfaces, along with the proposed FRA regulations, would have motivated those of ordinary skill in the art, in the industry, to flush or substantially flush mount video systems inside rail cars. The board went on to address why one of ordinary skill would have been so motivated, and how one of ordinary skill would have accomplished this, and how that was within the knowledge and ability of a person skilled in the art. So under this board's precedent, including the Nike case, which we cited to the board below, and in our appeal brief at 812F1326, page 1335, that case says that a claim to mention may be obvious, even when the prior art does not teach each claim limitation, so long as the record contains some reason that one of ordinary skill in the art would modify the prior art to obtain the claim of mention. So the board's factual findings support or have an independent basis for the conclusion of obviousness, even if you don't even look at CICEL, which when it comes to CICEL, I would say that thank you. With respect to CICEL, they first made the argument these are adversarial proceedings. If that's what they wanted to argue to the board, they should have said so. The fact that the board didn't have fair notice of this argument is apparent when they summarized what the patent owner's arguments were below, and they didn't say that the patent owner argued that CICEL was not an analogous art because they never made that argument. They didn't say the words. They didn't cite any cases that go to that issue. They didn't cite the test. So everything that they argued was in the context of, well, would there have been a motivation to combine? Would there have been a reasonable expectation of success? So they didn't give the board or us notice that they were making this argument, and it should be found weight for that reason. But even if you're going to consider this argument, there is substantial evidence in the record to support that CICEL is analogous art. There's a lot of similarities in terms of structure and function. You have two references that are directed to display devices. Now, there's a case law that says the field of the endeavor doesn't have to be the narrowest concept of the field. Or the particular focus within the field. They're both related to display devices. They're both related to display devices that are structured to be housed at the interior of a wall. They both have in common CRT televisions. Claim one doesn't limit it to LCDs. ANSYSAC clearly discusses CRTs as well as rear projection televisions. So there's sufficient commonality between the two that it would have been analogous art as a matter of law. And I can go more into the details of why the board's motivation finding is supported by substantial evidence irrespective of CICEL. The board pointed on page 28 to the American Railcar Specifications, which required smooth and clean interior surfaces. And that was to conserve space and for aesthetic purposes. And this was accomplished, as Mr. Mallow, our expert, set forth in his declaration, by flush mounting equipment. So there were a variety of things that were being flush mounted at the time. PA systems, fans, lights. And there was even a reference in the record that Mr. Mallow described as part of his state of the art, which shows a video display flush mounted in the railcar. That was the Japan Train Operator Association magazine reference. That was part of the non-institutional grounds. It was an alternative reference that we relied on. But it was part of the state of the art that Mr. Mallow described in his declaration. So when they say that there's no evidence of a flush mounted video display in the railcar, that's just not true. That is included in the record. There was also evidence of a proposed federal regulation. There was an advance notice of proposed rulemaking by the Federal Railroad Administration that required interior fittings to be recessed or flush mounted to avoid injuries to passengers in the event of a collision or derailment. These rules were developed with the help of industry and were meant to create comprehensive safety standards for the railcar industry. So all the motivations that the board relied on aren't hindsight, as Blair alleges, but evidence of industry consensus of best practices before the time of the invention that wasn't just known by document by federal agency. So there's more than enough evidence in the record to support that there was a motivation to flush mount LCD screens in railcars at the time. If we were to affirm here, then that would render your motion for issue preclusion moot. Is that right? If you were to affirm, yes. But we do have that motion pending because there was a second IPR where a similar issue was decided by the board. They didn't appeal that, so it's a final judgment on the merits addressing the same issues that found adverse to Blair on this point. And issue preclusion would attach to that, even though this case is on appeal, because the elements of preclusion are met and there's no evidence, as Blair argues, that there was any unfairness to the board's proceeding or inherent in the PTAB process or anything of that nature that would somehow indicate that issue preclusion should not be applied in this case. Going back to Sassafra for a moment, in addition to the field of endeavor that I mentioned, why these two references are part of the same field of endeavor, I'll just note, I know it's not dispositive, but they belong to the same international classification on the face of the patents. So that is an indication that they are part of the same field. In addition, they address the same problems. The patent talks about moving the screens back so that they're substantially flush to achieve a better aesthetic outcome. Sassafra also talks about reducing the visual noise factor, which is directed to aesthetics, and it shows how that helps the viewer from the perspective of the viewer looking at this. You don't have anything jutting out, and therefore it's more aesthetically pleasing. So there is evidence in the record to support that they have common purposes, which means they're addressing the same problems as well. So under the second part of the analogous argument test, it would also be found pertinent. Addressing for a minute their arguments about fire safety and cavity space, these are arguments they made below what the board found in Kawasaki's favor based on substantial evidence. The board found on page 27 that Namikawa has a cavity space that would allow flush mounting of screens, and somebody of ordinary skill would know how to flush mount. With respect to fire safety, the board found that the cavity space of Namikawa can have wires and conduits and still provide for ventilation of TVs, and that the Namikawa LCDs don't even generate enough heat, so they wouldn't have needed ventilation in the first place. That's based on substantial evidence in the record and should be affirmed. Now they didn't put in any evidence of their own on the fire safety issue in their Pat Nona response. They raised this for the first time in a post-reply deposition of our expert, and we pointed out in our observations that the testimony that they cite for this proposition isn't supportive of what Mr. Mallett said and, in fact, is supported by what the board cited of Mr. Mallett's testimony, which is somebody of skill in the art would have known how to do this. This is not a very difficult thing to do and well within the knowledge and ability of a person of skill in the art. There is also a dependent claim here, a claim for which they've made what I will say is a separate patentability argument, but not really. All that claim requires is that the video system be sound free. The board spent two pages of its opinion at page 36 and 37 going through the testimony on this issue as to why it would have been obvious to want a board member of skill in the art. They didn't put in any contrary testimony. All they said is, well, if that were the case and this would have been obvious, then the prior art should have said so. And I would submit that based on the evidence that's actually in the record, the board's finding is supported by substantial evidence. One point I'd like to address is the board also found on page 28, in addition to the specifications and the FRA, that flush mounting was the norm in the rail industry. And as I mentioned, there was testimony that other equipment was being flush mounted. Now, Blair, below at appendix pages 233, 243, 244, and 247, conceded that it's reasonable to conclude that prior to 97, one skilled MDR would have been aware of installing interior fittings in a rail car in a recessed or flush mounted manner. Now, they said that doesn't include TVs, but they didn't provide any persuasive evidence why that wouldn't apply to TVs. And if you look at the definition of interior fittings, and the FRA proposed regulations, you'll see that it nowhere excludes TVs. It says that it's any auxiliary component that's meant to be projected into the rail car. And their experts said that a TV could be an auxiliary component, and therefore would have been subject to the rules. Okay. Thank you. Thank you. The field, as Kawasaki argues, that's appropriate is this video display systems, which if a video display systems is the appropriate field, jumbotrons in my cell phone in my pocket would be a video display system. Clearly not the appropriate field of endeavor for a TV media system in a railway car. In fact, all the references that Kawasaki presented to the board and were considered by the board all involve specifically, as I noted earlier, TV media systems in a rail car or subway car. So there's no support, and it would be a sliding scale to broaden the relevant art or field of endeavor to a video display system, and that is so broad anything could be a video display system. It would not provide any assistance to one of ordinary skill in the art in trying to figure out what the relevant reference is, because anything that could display video or TV would be relevant. We submitted that the relevant endeavor here is a subway TV media system or a rail car media system, and all the references that are relied on address that. This FRA that, except for Sasao, excuse me, all the references the board relied on except Sasao involve, again, a rail car. Kawasaki's expert admitted that, on the record, that fire safety was a concern, and the FRA was to be interpreted in light of its objectives was to prevent fires. So obviously it was a major consideration, and things needed to be flush, provided that they don't create a fire. I guess my time is up, so I will stop. Thank you, Your Honor.